**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| Sun Commodities, Inc., <br><br> Plaintiff and Counter Defendant, <br><br> v. <br><br> Island Fresh de Puerto Rico, Inc. et al, <br><br> Defendant, Counter Claimants, and Third-Party Plaintiffs. | Civil. No. 20-cv-1236(GMM) <br><br> RE: PACA, 7 U.S.C. §§499, et seq. |

## OPINION AND ORDER

Before the Court is *Defendants Island Fresh and Jorge Mayendía's Motion for Summary Judgment and Memorandum in Support Thereof* ("Motion for Summary Judgment") filed by Co-Defendants Island Fresh de Puerto Rico, Inc. ("Island Fresh") and Jorge Mayendía-Valdes' ("Mayendía") (collectively "Co-Defendants"). (Docket Nos. 446; 447). The Court **DENIES** Co-Defendants' Motion for Summary Judgment.

### I. RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

This suit arises from the breakdown in the commercial relationship between Sun Commodities, Inc. ("Sun" or "Plaintiff") and Island Fresh. From around December 2019 through April of 2020, Sun sold fresh produce to Island Fresh, which is owned by Mayendía. (Docket Nos. 30; 30-1). Sun alleges that Island Fresh never paid Sun for the accepted produce, despite having sold it to a third party for consideration. (Docket No. 30 at 4). Plaintiff further

contends that Island Fresh, at Mayendía's direction, then transferred the profits it had made on the sold produce, which Sun argues qualified as Perishable Agricultural Commodities Act ("PACA") Trust Assets, to JC Brokerage, Inc. ("JC Brokerage"), another company owned by Mayendía. (Id. at 6).

On May 21, 2020, Sun initiated this suit against Island Fresh and its owner Mayendía. It alleged violations of PACA at 7 U.S.C. § 499c(e) seeking payment of $ 1,225,463.25. (Docket No. 1). Then, on June 5, 2020, the Court granted a preliminary injunction against Island Fresh. It ordered Co-Defendants to pay Sun the PACA trust assets it owed in the amount of $950,000.00. (Docket No. 27). Sun filed its *First Amended Complaint* ("Complaint") on June 17, 2020, adding JC Brokerage as a defendant and including additional allegations that Island Fresh transferred its PACA trust assets to JC Brokerage. (Docket No. 30).

On June 29, 2020, Co-Defendants filed their *Answer to the First Amended Complaint* ("Answer"). (Docket No. 54). Therein, Island Fresh and Mayendía allege that Island Fresh was created to be a subsidiary and joint venture between Mayendía and executives at Sun. Co-Defendants argued that Mayendía, in reliance on discussions he had with Sun executives, fronted the money to establish Island Fresh and authorized Sun executives to make decisions on Island Fresh's behalf. Thus, in their Answer, Island Fresh and Mayendía also brought a Counterclaim for collection of

monies and tortious interference, and sought loss of goodwill damages, compensatory damages, and attorney's fees. (Docket No. 54).

The Court extended the issued Preliminary Injunction to Mayendía and JC Brokerage on June 30, 2020. The extension was based on evidence that Mayendía owned both JC Brokerage and Island Fresh and that in April of 2020 JC Brokerage had: (1) assumed control of Island's assets and operations; (2) that multiple customer checks payable to Island Fresh were cashed in JC Brokerage's account; and (3) that on February 26, 2020, $225,000 were transferred from Island's account to pay off a loan to JC Brokerage. (Docket No. 59).

The First Circuit affirmed the District Court's injunction on August 14, 2023. (Docket No. 399). *See* Sun Commodities, Inc. v. Island Fresh de Puerto Rico, Inc., No. 20-1731, 2023 WL 7474486, at *1 (1st Cir. Aug. 14, 2023) ("Island Fresh raises an array of procedural and substantive claims against the grant of the preliminary injunction. These include the purported absence of "necessary" parties under Fed. R. Civ. P. 19; [Sun] s' alleged failure to comply with PACA's statutory prerequisites; and "unclean hands" on the part of [Sun] … The defense's arguments have been reviewed with care by this court, but they do not cast any doubt on the district court's considered exercise of discretion

in favor of preserving [Sun]' s interest under PACA in the proceeds from sold produce.").

On March 2, 2021, Island Fresh and Mayendía filed a Motion for Summary Judgment on Sun's Complaint. The Court denied Co-defendants' Motion for Summary Judgment without prejudice as moot on September 30, 2022. (Docket Nos. 263; 387). On February 2, 2024, with leave of the Court, Co-Defendants re-filed their Motion for Summary Judgment. (Docket Nos. 446; 447). Sun filed *Sun's Opposition to Motion for Summary Judgment by Island Fresh and [Mayendía]* ("Opposition") on February 8, 2024. (Docket No. 449). On February 14, 2024, the Court granted Co-Defendants' *Motion for Leave to File Reply*; such reply was filed at Docket No. 450. (Docket No. 452). The Court now considers Co-Defendants' refiled Motion for Summary Judgment.

## II.   SUMMARY JUDGMENT STANDARD

### A.   Federal Rule of Civil Procedure Rule 56

Motions for summary judgment are governed by Federal Rule of Civil Procedure Rule 56. Rule 56 provides that summary judgment is appropriate when the moving party establishes that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "genuine issue exists where a 'reasonable jury could resolve the point in favor of the nonmoving party.'" Meuser v. Fed. Express Corp., 564 F.3d 507, 515 (1st Cir. 2009) (*quoting* Suarez v. Pueblo Int'l,

Inc., 229 F.3d 49, 53 (1st Cir. 2000)). "A fact is material only if it possesses the capacity to sway the outcome of the litigation under the applicable law." Vineberg v. Bissonnette, 548 F.3d 50, 56 (1st Cir. 2008) (internal quotation marks omitted). In granting a Rule 56 motion, the Court must conclude that "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Calderon Amezquita v. Rivera-Cruz, 483 F. Supp. 3d 89, 101 (D.P.R. 2020) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)).

In a summary judgment motion, the moving party bears the burden of proving that there is a lack of material evidence supporting the non-movant's case. Cellotex Corp., 477 U.S. at 325; see also Ocasio-Hernández v. Fortuño-Burset, 777 F.3d 1, 4-5 (1st Cir. 2015). "Once the moving party has properly supported [its] motion for summary judgment, the burden shifts to the nonmoving party, with respect to each issue on which [it] has the burden of proof, to demonstrate that a trier of fact reasonably could find in [its] favor." Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000) (quoting DeNovellis v. Shalala, 124 F.3d 298, 306 (1st Cir. 1997)). In considering a motion for summary judgment, the court must consider "the record in the light most favorable to the nonmovant' and must make all reasonable

inferences in that party's favor." <u>García-García v. Costco Wholesale Corp.</u>, 878 F3d 411, 417 (1st Cir. 2017). *See also* <u>Murray v. Kindred Nursing Ctrs. W. LLC</u>, 789 F.3d 20, 25 (1st Cir. 2015).

B.   <u>Local Rule 56</u>

This Court also evaluates motions for summary judgment under Local Civ. R. 56. *See* Local Civ. R. 56. "Local Rule 56 is in service to Federal Rule of Civil Procedure 56." <u>López-Hernández v. Terumo P.R. LLC</u>, 64 F.4th 22, 26 (1st Cir. 2023) (*quoting* <u>Tropigas de P.R., Inc. v. Certain Underwriters at Lloyd's of London</u>, 637 F.3d 53, 56 (1st Cir. 2011)). It is an "anti-ferret rule ... intended to protect the district court from perusing through the summary judgment record in search of disputed material facts and prevent litigants from shifting that burden onto the court." <u>Id</u>.

Local Rule 56 provides that the non-moving party must "admit, deny or qualify the facts supporting the motion for summary judgment by reference to each numbered paragraph of the moving party's statement of material facts." Local Civ. R. 56(c). For facts that are denied, the non-movant's "…opposing statement shall support each denial or qualification by a record citation. . ." <u>Id</u>. The non-moving party's opposing statement may also contain "a separate section [of] additional facts, set forth in separate numbered paragraphs and supported by record citation." <u>Id</u>. The moving party may then submit a reply that admits, denies, or qualifies the nonmovant's additional facts through "a separate,

short, and concise statement of material facts, which shall be limited to any additional fact submitted by the opposing party" that is supported by record citation. Local Civ. R. 56(d).

"Under Local Rule 56, a district court is free, in the exercise of its sound discretion, to accept the moving party's facts as stated ... when the statements contained in the movant's Statement of Uncontested Facts ... are not properly controverted." López-Hernández, 64 F.4th at 26; *see also* Ramirez-Rivera, No. 3:21-CV-01158-WGY, 2023 WL 6168223, at *2 ("The First Circuit's repeated admonition on this issue in the last few years, places the Puerto Rico federal bar on clear notice that compliance with Local Rule 56 is a mandate, not a suggestion."). Litigants ignore Local Rule 56(c) at their peril. *See* López-Hernández, 64 F.4th at 26.

### III. UNCONTESTED FACTS

After examining the record and disregarding any legal arguments and conclusory statements in the Parties' submitted facts, the Court finds the following material facts to be undisputed and supported by the tendered exhibits.[1]

1. Walter Pérez ("Pérez") is an Executive Vice President at Sun. (Docket Nos. 442-1 ¶ 4; 446 ¶ 1; 449-4 ¶ 1; 456 ¶ 4).

2. Mike Leslie ("Leslie") is a partial owner and CEO of Sun. (Docket Nos. 446 ¶¶ 103, 128; 449-4 ¶¶ 103, 128).

---

[1] The Court identified multiple instances in which the submitted facts were not supported by their cited exhibits. The Court cautions Parties to verify that their statements of fact are supported by their attached evidentiary filings as required by Federal Rule of Civil Procedure Rule 56 and Local Civil Rule 56.

Civil No. 20-1236(GMM)
Page -8-

3. Pérez reports to Leslie. (Docket Nos. 446 ¶ 104; 449-1 ¶ 104).

4. Pérez oversaw Sun's accounts in Puerto Rico. (Docket Nos. 446 ¶ 136; 446-50 at 23; 449-4 ¶ 136).

5. Mayendía was Pérez' personal friend. They had been friends for approximately 32 years. (Docket Nos. 446 ¶¶ 8-9; 446-1 at 24; 449-4 ¶¶ 8-9).

6. Sun was experiencing problems with AgroProduce, the company that handled Sun's cruise ship operations in Puerto Rico. Given these challenges, Pérez became aware of the possibility of entering an agreement with another Puerto Rican company, that would sell produce to cruise ships. (Docket Nos. 446 ¶¶ 17, 50; 446-1 at 37-38, 91; 449-4 ¶¶ 17, 50).

7. Sun "scanned" Puerto Rico to see who might be able to create such a cruise operation and approached Mayendía. (Docket Nos. 446 ¶ 18; 446-1 at 38; 449-4 ¶ 18).

8. Leslie met with Mayendía and Pérez to discuss doing the cruise business in Puerto Rico. (Docket Nos. 446 ¶ 106; 449-4 ¶ 106).

9. Leslie, Mayendía, and Pérez discussed "in abstract" how such an operation might run should they go into business together, and at that time percentages were discussed. (Docket Nos. 446 ¶ 22; 446-1 at 42-44; 449-4 ¶ 22).

10. Luis Rivera ("Rivera"), who previously worked for AgroProduce, was hired by Island Fresh to manage the cruise operations. (Docket Nos. 446 ¶¶ 2-3; 446-1 at 18-19; 449-4 ¶¶ 2-3).

11. As part of the discussed plan for Sun and Mayendía to go into business together, Sun agreed to cover Rivera's salary. (Docket Nos. 446 ¶ 21; 446-2; 449-4 ¶ 21).

12. The conversations between Pérez and Mayendía about the potential company transcended the cruise ship context to include the sale of produce to stores and supermarkets in Puerto Rico. (Docket Nos. 446 ¶ 23; 449-4 ¶ 23).

13. José Puente ("Puente"), a retired salesman who previously worked at Sun and AgroProduce, was put in charge of the sale of produce to the local stores in Puerto Rico, including Selectos and Pueblo Supermarket. Puente left retirement to work at Island Fresh. (Docket Nos. 446 ¶¶ 5, 6, 25; 449-4 ¶¶ 5, 6, 25).

14. During the times when Leslie, Pérez, and Mayendía were "exploring" working together, Pérez met with Mayendía and Paul Robbins ("Robbins") at an apartment in the Condado area to discuss different locations where the new company could operate, given the operational requirements set by the cruise ships. (Docket Nos. 446 ¶¶ 26-27, 49; 449-4 ¶¶ 26-27, 49).

15. During the month of April 2018, Pérez and Mayendía, coordinated and eventually met with a representative of BDO (an accounting consulting firm) to discuss tax scenarios for the new company. (Docket Nos. 446 ¶ 52; 449-4 ¶ 52).

16. Pérez and Mayendía interviewed the accounting firm (MEC) that Island Fresh eventually hired to do its accounting. (Docket Nos. 446 ¶ 30; 446-1 at 52-53; 449-4 ¶ 30).

17. Sun does not hire accounting firms for their buyers. (Docket Nos. 446 ¶ 138; 449-4 ¶ 138; 262-42 at 80).

18. Starting around February 22, 2018, Pérez and Mayendía looked at warehouses for the new company. (Docket Nos. 446 ¶ 32; 446-1 at 61-62; 449-4 ¶ 32).

19. Leslie traveled to Puerto Rico to see warehouses. (Docket Nos. 446 ¶ 115; 449-4 ¶ 115).

20. On March 16, 2018, Mayendía texted Pérez stating:

> G [sic] morning. I need to be sent the one from Eagle to compare it with what I have from Caribbean Shipping. Shipments and transfer [Mayendía].
>
> I just finished talking to the person from the warehouse. This person is willing to negotiate

        with us the contract if we get to do business
together and we have more volume.

        Okay. Good news. I'll work the numbers you
need, and I will send them to you as soon as
possible. Let me know when you receive the
document to improve the cruise ships. Try to
get information on the Pueblo meeting and
about the contract.

        Thanks.

(Docket Nos. 446 ¶ 33; 446-5; 449-4 ¶ 33).

21. On March 29, 2018, Mayendía texted Pérez stating:

        The name is Island Fresh de Puerto Rico . . .
My Attorney is looking in the dep[artment] of
state. . . . Counsel says that up to now there
is nothing with that name.

  To this, Pérez replied:

        Perfect that he register [sic] is quickly to
see it if he is given it.

(Docket Nos. 446 ¶ 34; 446-6; 449-4 ¶ 34).

22. On March 29, 2018, at 2:45 pm, Mayendía sent Pérez an
e-mail containing JC Brokerage's weekly payroll. (Docket
Nos. 446 ¶ 35; 446-1 at 71-72; 446-7; 449-4 ¶ 35).

23. On April 2, 2018 at 1:41 p.m., Mayendía e-mailed Pérez
stating:

        We need the following[:]

        The corporation was registered and we are given
some days to make it official before completing it
with the following[:]

        Zip code of the corp. physical and postal

        Name of the shareholders and the percentages of the
corp[oration]

> Postal and physical address of the shareholders
> E-mail of the shareholders
> President
> Vice-President
> Treasurer
> Secretary
> Assistant Secretary
>
> [Mayendía]

(Docket Nos. 446 ¶ 38; 446-8; 449-4 ¶ 38).

24. On April 3, 2018, at 6:39 am, Mayendía sent Pérez an e-mail with the subject line "Agro customer list" which stated:

> G[ood] morning [sic] morning. Important if you don't have access then that Luis [Rivera] get you the customer list. Before leaving. We need that to serve as a guide for us. [Mayendía].

(Docket Nos. 446 ¶¶ 40-41; 446-10; 449-4 ¶¶ 40-41).

25. On April 4, 2018, Pérez sent Mayendía, via text message pictures of a confidential agreement between AgroProduce and Pueblo Supermarkets for the sale of produce. The agreement was to last from April 1, 2018 to April 1, 2019. (Docket Nos. 446 ¶ 45; 446-1 at 82-85; 446-16; 449-4 ¶ 45).

26. At some point in time between April 5 and April 6, 2018, Mayendía and Pérez had the following exchange.

Pérez wrote:

> The walls have to be pressure cleaned. All the walls have to be painted after they are cleaned. All the mold has to be eliminated to be able to do the Primus sanitation inspection. More lights have to be placed and last the floors of all the refrigerators we are going to use have to be cleaned.
>
> It is important that we sit with Ponce to negotiate a better rate for the containers. It

would possibly be better to offer to them to
pay rent for 20,000 square feet for
refrigerators or something like that. Call me
and we can discuss what I have in mind. It is
necessary to have a floor cleaning machine.
Find out if we can rent one in Puerto Rico.

Mayendía replied:

I already wrote Ponce. He works with
everything. I even mentioned to him lowering
the rates. Square feet or by container
whatever is better for us. I told him
yesterday we saw a refrigerated warehouse for
much less money. The capacity of the
containers we have here is 35 containers.
Between all of them. So space we do have.
Equipment has to be rented or bought or leased
just for us. We don't have the luxury of
waiting to be given a finger with that volume.

I also sent an e-mail to [Robbins] on the man
for the cruise ships. He'll call me when he
lands.

[Robbins] called me and told me that he would
help us with the cruise ships and the man.

(Docket Nos. 446 ¶¶ 46-47; 446-18; 449-4 ¶¶ 46-47).

27. On April 6, 2018, Pérez e-mailed Mayendía stating:

"[Mayendía], the idea is a good one but we cannot
begin until we are ready to get the Agro[Produce]
boats out. We need to have all the other details
resolved."

(Docket Nos. 446 ¶ 43; 446-13; 449-4 ¶ 43).

28. On April 9, 2018, at 7:42 a.m., Pérez texted Mayendía
stating:

Good morning. Is it possible to prepare the
meeting with the people from the Ponce
warehouse for tomorrow in the morning let's
say at 11 AM so I can be present. I would
arrive in the flight that arrives at 9:45 AM

and I return in the <u>4:30 PM</u> flight. We have to prepare the conditions to move the cruise ships. Very important that the warehouse is ready for the initial inspection from the management of Royal Caribbean. Remember that we have an important visit on Wednesday and I have to be in Miami. Let me know if you can do it so I can get my ticket as soon as possible. I'll let you know at about <u>1 in the afternoon</u> if we go to Jax on Thursday. I have a meeting with [Leslie] in Pompano at <u>12</u>. Thank you.

(Docket Nos. 446 ¶ 51; 446-20 at 2; 449-4 ¶ 51). (Emphasis in the original)

29. Sun put into place a strategy to help Mayendía grow Island Fresh's business to compete with Pérez and AgroProduce.

(Docket Nos. 446 ¶ 58; 446-1 at 105; 449-4 ¶ 58).

30. A text exchange between to Mayendía and Pérez that transpired on September 20, 2018 reads as follows:

Mayendía stated:

I already have the egg lic[ense] approved. Permits to sell [to] cruise ships. Open account for [JC Brokerage] for cruise ships. Corporation done [I]sland [F]resh. Tax Payer Identification Number. Warehouse in an industrial zone So I ask myself what's left.

Pérez replied:

I think you have everything. The only thing left is to start which will be soon.

(Docket Nos. 446 ¶¶ 60-61; 446-25 at 2; 449-4 ¶¶ 60-61).

31. A text exchange between to Mayendía and Pérez that transpired on October 2, 2018 reads as follows:

Mayendía stated:

>     I already have the egg lic[ense] approved.
>     Permits to sell [to] cruise ships. Open
>     account for [JC Brokerage] for cruise ships.
>     Corporation done [I]sland [F]resh. Tax Payer
>     Identification Number. Warehouse in an
>     industrial zone So I ask myself what's left.
>
>     There is no way t[h]at Edwin makes the
>     decision to sell to [Leslie] if he doesn't
>     stop supplying him. I am sending you this
>     again because everything that we talked about
>     from my part has been done.
>
>     And obviously [Robbins] has been notified
>     since days ago that this Is also happening.
>
>     Everyone involved here are men who keep their
>     word. Over business interests.
>
>     There has to be some type of respect from
>     [Leslie] to you because you are the one that
>     that guy humiliated. And not because of that.
>     Because of our conversations since September
>     that you all began to call me. And I always
>     answered you even though that the original
>     topic still had not been talked about.

Pérez replied:

>     I told you to take it easy. Let me work the
>     situation. Everything I told you this morning
>     was in confidence so you would know what our
>     friend is thinking. But remember that he
>     changes the way he thinks day to day. Relax.

(Docket Nos. 446 ¶ 61; 446-25 at 3-5; 449-4 ¶ 61).

32. Between November 9 and 10 of 2018, Mayendía and Pérez
    engaged in the following e-mail exchange:

Mayendía wrote:

>     Points to discuss
>
>     Cruise ships. This is the only one of all the
>     markets that we have discusses that worries me
>     because it is the only one that I have never

> done and I depend on other people for it to
> work and not myself.
>
> Personnel at the docks. Communication between
> the parties during the week. Depending on
> [Rivera] for the pineapples, bananas,
> plantains
>
> My other doubts is [sic] when do we begin with
> the business with Puente and Blasini and what
> customers concretely we are going to attack
> already. It seems to me that we have to open
> [the] door already and say that we are ready
> to sell. And if we get the right warehouse
> follow up.
>
> [Mayendía].

Pérez replied:

> Thank you for the information. And I think you
> have to stop worrying. If you begin a business
> being negative the results are not going to be
> positive. Let's talk on Monday. Hope you enjoy
> your weekend.

(Docket Nos. 446 ¶¶ 62-63; 446-28; 449-4 ¶ 62-63).

33. In November of 2018 around Thanksgiving, Sun paid for
    Mayendía and Rivera's airfare and stay in Florida for a
    meeting. (Docket Nos. 446 ¶¶ 64, 110; 449-4 ¶¶ 64, 110).

34. On December 3, 2018 at 4:19 pm, Pérez sent Rivera an e-
    mail at his personal e-mail address,
    luisriveramiranda@yahoo.com. The e-mail was titled
    "D&B". "D&B" stands for Dun & Bradsheet, a credit service
    out of Wall Street. The e-mail stated:

> [Rivera], this is the information.
> Owner: [Mayendía], 100%.
> Legal name of the company:
> Island Fresh de Puerto Rico, Inc.
> Phone: 787-777-1888.
> Dirección física
> Calle 3, Lote 10-13. . .

(Docket Nos. 446 ¶¶ 65-66, 68-69; 446-33 at 1; 449-4 ¶¶ 65-66, 68-69).

35. On January 10, 2019 at 4:11 pm, Robbins e-mailed Leslie, Pérez, and Mayendía, stating:

> Gents,
> Please find pictures of a $20,000 square warehouse with close proximity to the port siting on 4 acres. Broker says you can get 8 doors in this building. 28' ceiling clearance/no columns.
> 120 parking spaces.
> Owner asking $4M.
> Carlos say[s] he will take $2M.
> One more set of pictures to follow.

(Docket Nos. 446 ¶ 76; 446-36 at 1; 449-4 ¶ 76).

36. On January 11, 2019, at 3:03 pm, Mayendía e-mailed Leslie and Pérez providing further information on a warehouse. (Docket Nos. 446 ¶ 78; 446-37 at 1; 449-4 ¶ 78).

37. On April 22, 2019, Mayendía and Pérez had the following text exchange:

Mayendía wrote:

> The amount that is owed to [sic] me [is] approx[imately]... Between [Rivera], attorney['s costs], cruise ships, office arrangements, opening bank accounts. Up to now that have not been finished everything is 34,800.

Pérez responded:

> Ok. I'll pass it along to [Leslie]. I need you to prepare all the receipts and documents that collaborate those expenses because [Leslie] is going to ask for them.

(Docket Nos. 446 ¶¶ 80-81; 446-38; 449-4 ¶¶ 80-81).

38. On April 27, 2019, Byron Miranda ("Miranda"), Sun's Comptroller who reports to Bernal, e-mailed Pérez stating:

> [Pérez],
>
> I don't know if Jason sent you the first set of invoices, but here they are. We automated it so that the invoices will be e-mailed when billed.
>
> Thanks.
>
> [Miranda].

(Docket Nos. 446 ¶¶ 84, 130; 446-41; 449-4 ¶¶ 84, 130).

39. On June 1, 2019, Mayendía texted Pérez stating:

> You know that I haven't wanted to or tried to bother you at this time. But I need the money urgently. Remind the partner that when I began last year to get money out of the [JC Brokerage] I never had any objections neither did I need projections. Now the [JC Brokerage] circle is closing on me and also in [Island Fresh]. I have customers that logically kept the [JC Brokerage] checks in the drawers for [deposit at] a later date. And I need to pay suppliers and expenses so that we don't have any problems. Trust toward me reaches up to a point. You know that. My buttons are already being pushed because I am also not buying from them and they know that they are not my bank. I already had to take from [Island Fresh's] operational [funds] to pay cruise ship bills. I need the money. [Leslie] has to give it to me because first we know that its mine. Second I feel squeezed by so many bills and I don't even know from where else to get it. I am sorry to write you this now but I can't wait anymore for a partner who knows he owes me. . .

(Docket Nos. 446 ¶ 90; 446-43; 449-4 ¶ 90).

40. Ruth Bernal ("Bernal") is the Chief Financial Officer of Sun. (Docket Nos. 442-1 ¶ 1; 446-4 ¶ 127; 449-4 ¶ 127; 456 ¶ 1).

41. Bernal has never been an employee, officer, director, or owner of Island Fresh. (Docket Nos. 442-1 ¶ 2; 456 ¶ 2).

42. Bernal reported to Leslie regarding the situation with Island Fresh from May or June of 2019 to May or June of 2020. (Docket Nos. 446 ¶ 129; 446-50 at 91; 446-4 ¶ 129).

43. Since June of 2019, Bernal received weekly reports, weekly bank statements, balance sheet statements, PNL's, cash positions, account receivables and account payables agings, among others. (Docket Nos. 446 ¶ 143; 446-54 at 109; 449-4 ¶ 143).

44. At some point in time during the summer of 2019, Bernal began receiving daily bank statements from Island Fresh.

(Docket Nos. 446 ¶ 144; 446-54 at 108-109; 449-4 ¶ 144).

45. Bernal did not receive daily bank accounts from any other client, other than Island Fresh. (Docket Nos. 446 ¶ 145; 446-54 at 110; 449-4 ¶ 145).

46. Island Fresh's invoices for the cruise ship accounts were prepared by Sun in Florida. (Docket Nos. 446 ¶¶ 85, 139; 446-1 at 135; 449-4 ¶¶ 85, 139).

47. The transaction between Sun, Island Fresh, and the cruise ships was identified by Bernal as a passthrough transaction." (Docket Nos. 446 ¶ 146; 446-54 at 112; 449-4 ¶ 146).

48. Bernal gave accounting to support to one other client, AgroProduce. (Docket Nos. 446 ¶ 132; 446-54 at 44-46; 449-4 ¶ 132).

49. On June 11, 2019, Pérez e-mailed Miranda:

    Hello [Miranda].

    We had a conference with [Bernal] and Maria Elena yesterday for about an hour. Maria Elena

is in charge of the accounting firm (MEC) that we hired to do our books. I'm sure [Bernal] will fill you in on all the discussions that we had. This morning Maria Elena will send [Bernal] all the documents, paper work and other requests that [Bernal] made so that we can get the wire transfer that we so desperately need to make payroll and pay the truck drivers tomorrow. As well as reimburse the out of pocket money that [Mayendía] put into Island Fresh and pay the accounting firm as well.

Thank you for your help.

[Pérez].

(Docket Nos. 446 ¶ 92; 446-45 at 2-3; 449-4 ¶ 92).

50. On July 17, 2019 at 4:25, Bernal e-mailed Island Fresh's accounting firm advising that money be moved from Island Fresh's operative account to Island Fresh's cruise ship account. (Docket Nos. 446 ¶ 140; 446-54 at 99-100; 446-58; 449-4 ¶ 140).

51. On April 1, 2020, Bernal requested Island Fresh to pay $205,478.78 from Island's operational account. Also, Bernal asked Island Fresh to transfer $100,000.00 from Island's eggs account to its operational account. (Docket Nos. 446 ¶ 154; 449-4 ¶ 154; 262-49).

52. On April 8, 2020, Bernal requested that Island Fresh pay
$153,112.54 from its cruise account for invoices already paid by Royal Caribbean Cruises as per an attached invoice list. (Docket Nos. 446 ¶ 155; 449-4 ¶ 155; 262-50).

53. On April 8, 2020, Bernal requested that Island Fresh pay $183,204.50 from its operational account as per an attached invoice list. (Docket Nos. 446 ¶ 156; 446-61; 449-4 ¶ 156; 262-51).

54. Sun does not instruct clients to make intra account transactions and only did it with Island Fresh. (Docket Nos. 446 ¶ 141; 446-54 at6 100-103; 449-4 ¶ 141).

55. There was never a written agreement between Mayendía, Leslie, and Pérez to be "joint venture partners" of Island Fresh. (Docket No. 447 at 11; 449-4 at 42 ¶ 1).

56. There was never a written agreement that Mayendía, Leslie, and Pérez were "owners" of Island Fresh. (Docket No. 447 at 11; 449-4 at 42 ¶ 2).

### IV. DISCUSSION

The Court now considers each of Co-Defendants' arguments in turn and concludes, for the following reasons, that outstanding disputes of genuine material fact preclude the Court from granting Co-Defendants' Motion for Summary Judgment.

### A. Was Island Fresh a joint venture?

Co-Defendants argue that Island Fresh was a joint venture between Mayendía and top executives at Sun, namely, Pérez (Sun's Executive Vice President) and Leslie (a partial owner and CEO of Sun) (collectively referred to as "Sun Officials"). Co-Defendants aver that Sun was a parent corporation that partnered with Mayendía to create Island Fresh to act as its subsidiary in managing the Puerto Rico market, with a special interest in servicing cruise ships. Given the purported joint venture relationship between Sun and Island Fresh, Co-Defendants allege that the Sun Officials are indispensable parties to the present dispute. Thus, the Sun Officials, according to Co-Defendants, must be joined pursuant to Federal Rule of Civil Procedure Rule 19. Island Fresh and Mayendía

consequently ask the Court to dismiss this case for Plaintiff's failure to join the Sun Officials as necessary Parties.

In its Opposition, Sun argues that summary judgment on the question of whether Island Fresh was a joint venture between Mayendía and Sun would be improper given that there are genuine questions of material fact on the matter. Specifically, Sun highlights that: (1) Pérez denied that Island Fresh was a joint venture; (2) Co-Defendants conceded that the Sun Officials were to become owners of Island Fresh only when Sun ceased its commercial relationship with AgroProduce, which Sun states it never did; (3) Island Fresh's PACA license listed Mayendía as the full owner of Island Fresh; and (4) the record lacks sworn testimony from Mayendía classifying Island Fresh as a joint venture. Given that Sun rejects Co-Defendants' contention that Island Fresh was a joint venture, it concludes that there are no grounds to find that the Sun Officials are indispensable parties whose absence in the present dispute merits its dismissal.

In Puerto Rico, a joint venture or joint enterprise is "broadly defined as an enterprise undertaken by several persons jointly to carry out a single business enterprise for profit, . . . in which they combine their property, money, effects, skill and knowledge." Maldonado v. Damas Found., 2015 U.S. Dist. LEXIS 193662, *24 (D.P.R. 2015) (internal quotations omitted). In determining whether a joint enterprise exists, courts must

consider: "(1) [w]hether there is a community of interests in fulfilling a common purpose[;] (2) [w]hether there is joint control or a right to joint control[;] (3) [w]hether there is a joint property interest over the substantive matter, in other words, that both shareholders contribute, either with their labor, capital, or otherwise, to the achievement of the common goal[;] (4) [w]hether there is a right to share in the profits[; and] (5) [w]hether there is a duty to share the losses that may be incurred." Llorens v. Arribas, 2011 TSPR 204, 184 D.P.R. 32, 63, 2012 Juris P.R. 5 (P.R. 2011). *See also* Maldonado, 2015 U.S. Dist. LEXIS 193662 at *23; Berrios v. Don Jacinto Dev. Corp., 2012 PR App. LEXIS 1007, *12-13 (P.R. Ct. App. 2012) ("to constitute a joint venture, some or all of the following factors must be present: a contribution by the parties of money, property, effort, knowledge, skill or other assets to a common undertaking; joint property interest in the subject matter of the venture and a right of mutual control or management of the Enterprise; a right to participate in the profits; and usually, a limitation of the objective to a single undertaking or ad hoc enterprise.")

Here, the Court concludes there is an open question of material fact as to whether Island Fresh was a joint venture between Sun, the Sun Officials, and Mayendía. The Parties do not dispute that there was no written agreement demonstrating that Island Fresh was a joint venture. However, there is a clear and

material factual discrepancy in the Parties' intent and understanding regarding <u>if</u> and <u>when</u> Island Fresh would be viewed as and or become a joint operation.

Co-Defendants note that Sun Officials were involved in the abstract conceptualization of Island Fresh from the outset and were actively engaged in inspecting potential warehouses, interviewing accounting firms, recommending employees, and directing accounting actions. Perhaps most notable, from the Court's review, is the June 2019 e-mail between Pérez and Miranda in which Pérez states that Sun CFO Bernal adjusted matters so that "<u>we</u> can get the wire transfer that <u>we</u> so desperately need to make payroll and pay the truck drivers tomorrow. As well as reimburse the out of pocket money that [Mayendía] put into Island Fresh and pay the accounting firm as well." (Docket Nos. 446 ¶ 92; 446-44; 449-4 ¶ 92). Such evidence suggests that Parties had a common purpose, joint control, and shared contributions to Island Fresh's development.

However, other undisputed facts on the record indicate that Sun and the Sun Officials had thus far only taken on an advisory role rather than an ownership stake in the development of Island Fresh. For instance, in an April 2018 e-mail from Pérez to Mayendía, the Sun Vice President stated that "<u>we cannot begin until we are ready to get the [Agroproduce] boats out</u>. We need to have everything—all other details resolved". (Docket Nos. 446 ¶ 43;

449-4 ¶ 43) (emphasis added). In his deposition, Mayendía admitted
that he was never told that Sun had ceased working with
AgroProduce. (Docket No. 449-2 at 7). The Parties also concur that
Bernal's provision of accounting advice to a customer was not a
unique service provided to Island Fresh. (Docket Nos. 446 ¶ 132;
446-54 at 44-46; 449-4 ¶ 132). Moreover, it is undisputed that
Mayendía was listed as the sole owner of Island Fresh in Island
Fresh's filing with Dun & Bradsheet, a credit service out of Wall
Street. (Docket Nos. 446 ¶¶ 65-66, 68-69; 446-33 at 1; 449-4 ¶¶
65-66, 68-69).

At summary judgment, the First Circuit has advised district
courts to proceed with caution when there exist issues of intent.
Coll v. P.B. Diagnostic Sys. Inc., 50 F.3d 1115, 1121 (1st
Cir.1995); *see also* Oliver v. Digital Equip. Corp., 846 F.2d 103,
109 (1st Cir.1988); Stepanischen v. Merchants Despatch Transp.
Corp., 722 F.2d 922, 928 (1st Cir.1983); Lipsett v. University of
P.R., 864 F.2d 881, 895 (1st Cir.1988). While an issue of intent
and or motive does not preclude summary judgment, the court should
only entertain such a motion ". . . if the nonmoving party rests
merely upon conclusory allegations, improbable inferences, and
unsupported speculation." Medina-Muñoz v. R.J. Reynolds Tobacco
Co., 896 F.2d 5, 8 (1st Cir.1990). Here, the Court believes there
is a legitimate factual dispute regarding whether Sun's intent was
to merely facilitate the development of a buyer that it might

partner with in the future to service the Puerto Rico cruise ship industry or to enter a joint venture with Mayendía.

The Court finds that Sun, as the non-moving party, raised substantive evidence to demonstrate that there is an open question of material fact as to whether Island Fresh was a joint venture between itself and Mayendía. For example, Bernal's sworn deposition, Leslie's sworn deposition, and one of Co-Defendants' e-mail exchange exhibits characterize the money that Sun paid Mayendía to cover Island Fresh's start-up expenses and payroll as a loan or debt that Mayendía was expected to repay. (Docket Nos. 446-50 at 77-78, 82; 446-54 at 54-55; 446-57). This raises a question as to whether Sun was actually sharing in Island Fresh's costs. As such, and in absence of evidence of a written or verbal agreement, the Court finds that the record raises a series of genuine issues as to the intent of the Parties in the development of Island Fresh. Accordingly, the existence of a joint venture is legitimate question of material fact better left for a jury to decide. Consequently, the Court need not, at this juncture, address whether Leslie and Pérez are indispensable parties requiring joinder under Federal Rule of Civil Procedure Rule 19.

B.   Waived PACA trust

Island Fresh and Mayendía argue that Sun failed to provide timely written notice of its intent to preserve its rights under PACA. Specifically, in Co-Defendants' Motion for Summary Judgment

they emphasize that "Any agreement between a seller and a buyer
"extending the payment period beyond thirty days generally
constitutes a waiver of rights under the PACA trust." (Docket No.
447 at 6). Co-Defendants allege that Sun repeatedly allowed Island
Fresh to pay for agricultural commodities outside the scope of the
30-day period without providing any factual grounds justifying its
tardiness. Given the repeated delays, Island Fresh and Mayendía
conclude that Sun waived all claims over the purported PACA trust
created for those purchases for which Sun failed to timely notify
Co-Defendants.

Sun argues that there is an open and genuine question of
material fact regarding whether Sun waived its PACA rights via
untimely written notification to Island Fresh of Sun's intent to
preserve those rights. Thus, Sun contends that summary judgment on
this question would be improper. Critically, Sun notes that
contrary to Co-Defendants' allegations, Sun's CFO, Bernal,
testified that "the payment terms on Sun's outstanding invoices
sent to Island Fresh were "10" days, and that Sun did not agree to
extend those terms." (Docket No. 449 at 3). Thus, Sun concludes
that there is a real factual dispute as to when Sun notified Island
Fresh of its intent to preserve its PACA trust assets.

The PACA, 7 U.S.C. § 499a, et seq., was enacted in the 1930s
for the purpose of "suppress[ing] certain unfair and fraudulent
practices in the marketing of fresh fruits and vegetables." <u>Alphas</u>

Co., Inc. v. Dan Tudor & Sons Sales, Inc., 679 F.3d 35 (1st Cir.2012) (internal citation omitted). Congress amended PACA in 1984 to create a statutory trust over "any goods, receivables, or proceeds from perishable agricultural commodities until the buyer makes full payment." Hiller Cranberry Products, Inc. v. Koplovsky, 165 F.3d 1, 5-6 (1st Cir.1999) (citing 7 U.S.C. § 499e(c)). Thus, today, "PACA creates a trust in favor of the seller of the unpaid goods which is superior to the interest of the buyer's secured lender." Id. at 6 (internal citation omitted).

Pursuant to PACA, an unpaid supplier of perishable agricultural goods must comply with various requirements to demonstrate that they qualify as short-term creditors. See e.g. Hiller Cranberry Prods., 165 F.3d at 8; A.J. Rinella & Co. v. Bartlett (In re Bartlett), 367 B.R. 21, 30 (Bankr. Mass. 2007); In re Davis Distribs., 861 F.2d 416, 417 (4th Cir. 1988). PACA mandates that an unpaid seller must give a buyer timely notice in writing of its intent to preserve its rights under the Act. See 7 U.S.C. § 499e(c)(3)-(4). Specifically, pursuant to PACA:

> The unpaid supplier, seller or agent shall lose the benefits of such trust unless such person has given written notice of intent to preserve the benefits of the trust to the commission merchant, dealer, or broker within thirty calendar days (i) after expiration of the time prescribed by which payment must be made, as set forth in regulations issued by the Secretary, (ii) after the expiration of such other time by which payment must be made, as the parties have expressly agreed to in writing before entering into the transaction, or (iii) after the time the supplier, seller, or agent has

> received notice that the payment instrument promptly
> presented for payment has been dishonored.

7 U.S.C. § 499e(c)(3) (emphasis added). Thus, a supplier must give a buyer written notice within 30 days of the "expiration of the time prescribed by which payment must be made pursuant to regulation." 7 C.F.R. § 46.46(f)(2)(i). As such, considering PACA's default 10-day payment period, a seller practically has 40 days, following a buyer's acceptance of the supplier's perishable agricultural goods, to inform the buyer in writing of its intent to preserve its PACA rights. *See* Id.; 7 C.F.R. § 46.2(aa)(5) ("Payment for produce purchased by a buyer [is due] within 10 days after the day on which the produce is accepted.").

In this case, the record establishes that there is a factual dispute as to whether Sun timely notified Island Fresh of its intent to preserve its rights under PACA, if at all. Notably, in Co-Defendants' Motion for Summary Judgment, they only cite a single fact to support this argument. Specifically, Docket No. 446 ¶ 148 which states that "Sun allowed in writing Island Fresh to pay for produce bought to Sun in excess of 30 days. Exhibit 41..."[2] Sun Produce denied this fact, noting that the lines in Bernal's testimony cited by Co-Defendants did not support Co-Defendants' claim. Moreover, in its Opposition to Co-Defendants' Motion for Summary Judgment, Sun submitted a statement made by Bernal under

---

[2] The Court notes that Exhibit 41 is either improperly labeled or cited. Exhibit 446-41 is an e-mail chain between Pérez and Miranda from April 2019.

penalty of perjury averring that Sun's written invoices to Island Fresh demonstrate that Sun required Island Fresh to pay Sun within a "Net 10 days." *See* Docket No. 449-3. Considering the record, the Court finds that there are open questions of fact as to whether Sun timely requested in writing the preservation of its PACA rights. Thus, granting summary judgment to Co-Defendants on this argument would be improper.

C.    Unclean hands

Finally, Co-Defendants argue that under the equitable doctrine of unclean hands, Sun's claims against Island Fresh, Mayendía, and JC Brokerage should be dismissed with prejudice. Island Fresh and Mayendía argue that Bernal gave an untrue sworn statement to Co-Defendants' detriment alleging that Mayendia dissipated $225,000 of Sun's PACA trust assets and transferred them to JC Brokerage. Co-Defendants contend that Bernal knew that the transferred funds were not derived from the sale of any produce that might qualify as a PACA trust asset. Despite this supposed knowledge, Island Fresh and Mayendía argue that Sun used Bernal's testimony to induce this Court to erroneously issue an injunction which financially harmed Co-Defendants and JC Brokerage.

In its Opposition, Sun again contends that there is an open question as to whether Bernal's testimony was, in fact, materially false. Moreover, Sun argues that there is a dispute as to whether the Court's issuance of a preliminary injunction was the result of

Bernal's testimony, given that the Court considered multiple other pieces of evidence in making that ruling. Sun also emphasizes that there is an open question of fact as to whether Island Fresh shut down because of the preliminary injunction that Co-Defendants allege was instigated by Bernal's supposed false testimony. On the latter points, Sun alleges that even if *arguendo* the Court finds that Bernal's testimony was misleading or false, the doctrine of unclean hands only applies in cases where the party claiming injury was prejudiced by their opponent's challenged actions.

It is well established that "[h]e who comes into equity must come with clean hands," <u>Keystone Driller Co. v. Gen. Excavator Co.</u>, 290 U.S. 240, 241 (1933). "The basic premise is that when a district court considers whether or not to award equitable relief, one factor that it must consider is the extent to which the plaintiff has engaged in certain misconduct." <u>Dr. Jose S. Belaval, Inc. v. Pérez-Perdomo</u>, 488 F.3d 11, 15 (1st Cir 2007). "The doctrine of unclean hands only applies when the claimant's misconduct is directly related to the merits of the controversy between the parties, that is, when the tawdry acts "in some measure affect the equitable relations between the parties in respect of something brought before the court for adjudication."" <u>Texaco P.R., Inc. v. Dep't of Consumer Affairs</u>, 60 F.3d 867, 880 (1st Cir. 1995) (*quoting* <u>Keystone Driller Co.</u>, 290 U.S. at 245). *See also* <u>Dr. Jose S. Belaval, Inc.</u>, 488 F.3d at 15-16 (*quoting* <u>Shondel v.</u>

McDermott, 775 F.2d 859, 869 (7th Cir. 1985)) ("Since "relatively few plaintiffs are wholly free from any trace of arguable misconduct at least tangentially related to the objective of their suit, the right to injunctive relief . . . would have little value if the defendant could divert the proceeding into the byways of collateral misconduct.").

In sum, the Court finds that Co-Defendants failed to meet their burden in showing that Plaintiff engaged in misconduct, much less misconduct meriting the invocation of the doctrine of unclean hands. Plainly, reviewing the undisputed facts, the Court cannot conclude that Bernal's sworn testimony was false. As such, granting Co-Defendants Motion for Summary Judgment on this matter would be improper.

## V. CONCLUSION

For the foregoing reasons stated above, the Court **DENIES** *Defendants Island Fresh and Jorge Mayendía's Motion of Summary Judgment and Memorandum in Support Thereof* (Docket Nos. 446 and 447).

IT IS SO ORDERED.

In San Juan, Puerto Rico, May 21, 2024.

s/Gina R. Méndez-Miró
GINA R. MÉNDEZ-MIRÓ
UNITED STATES DISTRICT JUDGE